Okay, our next case. Council, look ready. We're at 21-1382 Quayle v. Catholic Health Initiative. And Mr. Kalmanowicz. Thank you, Your Honor. Council, may it please the Court. I'm Ian Kalmanowicz. I'm here on behalf of the plaintiff appellate, Dr. Sejal Quayle. A jury should decide Dr. Quayle's case. Dr. Quayle claims that her employment was terminated because of her gender and in retaliation for her opposition to gender discrimination. Below, the district court engaged in improper fact-finding in Dr. Quayle's case when it determined that, quote, it is more likely than not that she was fired because she engaged in conduct prohibited by her employer for non-discriminatory reasons and the issues surrounding that conduct were not resolved, end quote. That determination, that it was more likely than not, that was weighing of the evidence by the district court, which is inappropriate under Rule 56, a summary judgment. Likewise, the district court improperly resolved factual disputes in resolving Dr. Quayle's retaliatory termination claim. There, the district court incorrectly held that because Dr. Quayle could not make out a claim for gender discrimination, she also could not make out a claim for retaliation. The district court made that decision by concluding that Dr. Quayle's, quote, various disciplinary infractions and her failure to take responsibility, unquote, were the but-for cause of her termination, not her protected activity of reporting gender discrimination. The district court can only reach that conclusion by resolving factual disputes about the reason for Dr. Quayle's termination. The district court's weighing of the evidence and summary judgment went beyond what is permitted under Rule 56 and usurped the function of the jury. At each step of the analysis of her claim, the district court erroneously applied the law to the facts and failed to follow Rule 56's edict that all inferences be resolved in favor of the non-moving party, Dr. Quayle. These failures mandate reversal of summary judgment so that Dr. Quayle may have a jury decide this case. Now, like most employment discrimination cases, Dr. Quayle's case is built on circumstantial evidence, indirect evidence, and inferences. And as this court well knows, the McDonnell-Douglas burden-shifting analysis is applied to determine if a plaintiff has sufficient evidence to bring that case to trial. In the district court, Dr. Quayle presented evidence that was sufficient to meet the requirements of McDonnell-Douglas and avoid summary judgment. At the first step of the analysis, the district court improperly considered one of defendants' stated rationales for Dr. Quayle's termination as part of the prima facie case of discrimination. Now, I say one of the stated rationales because in this case the defendant has offered multiple inconsistent reasons for Dr. Quayle's termination. One rationale was the doctor's failure to take responsibility for the allegations of, you know, abusive conduct or however you want to phrase it. In addition to that, what other reasons did they give for the termination? Sure. The decision maker, the CEO, testified that he made the decision to terminate Dr. Quayle because of her failure to accept responsibility for her behavior. The employer gave her a termination letter that said her employment was terminated without cause. But that was negotiated, wasn't it? It wasn't negotiated. It wasn't negotiated. So your position here today is that her leaving the hospital was not negotiated, that the hospital just canned her and they decided the way to do it was just to do it without cause, that she had not requested that. There's no evidence of that in the record. That's correct, Your Honor. She did not request to be terminated. She did not request to be terminated without cause. There had been a point in time when the CEO asked her what her desires would be in order to transition away from the hospital. She provided a list, but that list did not include termination without cause. Now, if they terminated her with cause, would she be able to have privileges? No, she would not be able to have privileges if she was terminated with cause. And one of the things that she wanted was to continue to have privileges, is that right? That's correct. All right. So if they, I mean, so it's parsing it a little thin, isn't it, to say that the hospital just came up with the without cause idea because they couldn't give her one without the other? Well, I think that the, I don't know that it's parsing it a little bit thin. I don't know if the contract would provide a mechanism for an end to the agreement that would allow her to keep privileges in the absence of a termination without cause. Presumably they could have put her on administrative leave until the end of the contract and just let it expire, and she would have then been able to maintain her privileges. Okay. Let me ask you another question. So I want to jump over to, I mean, I understand your argument on whether she made out a prime official case and how the district court made an error at that first step, but let's assume that you did make out a prime official case and the hospital rebutted it, what's your evidence of pretext? Well, I don't think that the hospital rebutted it, but assuming that we address the two arguments that the hospital raised in their motion for summary judgment. Okay, let me stop you for a minute. So did you attempt to make a, did you attempt, so the district court obviously thought the hospital did rebut it, and you had then a burden to come forward, at least at that stage, unless you can prove error and show pretext. What was your evidence of pretext before the district court? Sure. Part of our evidence of pretext at the district court were the multiple different explanations that were offered. The testimony by the decision maker, the decision was made solely because of the failure to accept responsibility for her behavior. The response to an interrogatory that asked why her employment was terminated, and the response was that her employment wasn't terminated. Her employment ended as a result of a mutual separation that occurred because of joint discussion and negotiations between the hospital and Dr. Quayle. A different reason that was offered was in response to the charge of discrimination filed with the EEOC, in the position statement, Mercy Hospital took the position that Dr. Quayle's persistent abusive behavior required the termination of her employment relationship. Now that statement's false. The CEO specifically testified that the behavior had nothing to do with the decision to terminate. So in light of these differing explanations, one, that it's the behavior, when we tell the EEOC we let her go, it was because of the behavior. They didn't tell the EEOC that she was let go because of a jointly negotiated mutual separation. That would have been a great argument to the EEOC. There wouldn't have been an adverse action for the EEOC to investigate. Instead, they waited until discovery to take that position, to not be pinned down as to a reason for the termination. And these shifting explanations are evidence of pretext. Explain that a little bit more to me. How would multiple explanations lead to a conclusion of pretext? Well, because these multiple explanations can't all be true. They cannot all be true. It can't be true when Mercy responds to the EEOC, and Mercy Council prepares a statement saying that Dr. Quayle was terminated because of her persistent abusive behavior. That statement can't be true when the CEO who made the decision to terminate her says, her behavior wasn't the reason for the termination. The statement that we made the decision jointly to negotiate a separation can't be true if the persistent abusive behavior is the stated reason, or if her failure to accept responsibility is the stated reason. Frankly, I don't think we'd be here if there was a jointly negotiated separation. I guess I understand that, but I guess why would multiple explanations suggest pretext? I mean, maybe at the particular time when asked, that's what the person thought the reason was, but it doesn't. How do you get to the jump? Sure, so in Price Waterhouse, the Supreme Court counseled that we have to look to the decision at the time the decision was made. Now, I don't know how Mercy could look to the decision at the time it was made and tell the EEOC that it was persistent abusive behavior when that's not what the CEO said motivated him to terminate her. I guess my better response, though, Judge Iyde, would be that when these explanations are inconsistent with each other. This isn't multiple explanations like she was late and she didn't do her work on time and she was mean to the staff. Those multiple explanations would all be consistent with a decision to terminate. Here, some of these explanations are false based on the evidence in the record, and a jury should determine the credibility of these. Which ones were false? Well, I don't know. That's the problem. The CEO testifies that at his deposition that I made the decision to terminate her, and the decision was made solely because she refused to accept responsibility for her behavior. If we credit that as true, then the other explanations are false. But it's the jury's role to credit that as true in light of these contradictory explanations that are given under oath, a sworn response to an interrogatory that is inconsistent with sworn deposition testimony. The jury should be the arbiter of the credibility of those explanations, not the district court at summary judgment. We're here on a sex discrimination complaint, right? Yes. And, you know, as I understand the facts, a complaint was made to management, for want of a better term. They investigated the complaints and then, you know, demanded that she, you know, take this disciplinary, you know, this performance plan, the PREP. And, you know, and the facts unfold. But the decision maker who imposed the performance plan, you know, ultimately the decision maker that terminated her, what's the evidence that those, I guess, different persons were motivated by an animus based on sex? Sure. At every stage of this case where this issue about Dr. Quayle's conduct came up, Dr. Quayle raised the issue of gender. When the first patient complaint was raised, she said to the HR director and the chief of the medical staff that why am I being treated differently than men? Men engage in the same behavior as me and nothing happens to them. They're not investigated. They're not given disciplinary review. Well, that's kind of the heart of my question. And that continues, Your Honor. Management responded to a complaint from a member of the staff. Is that correct? Is there evidence that there were complaints to management about abusive conduct that was not investigated and led to performance plans? Yes. Dr. Quayle, in the initial interview that she had on August 1, 2017, with the HR director, raised the issue of two different male physicians engaging in similar behavior and not being investigated or disciplined, including her partner. Anybody made a complaint regarding the two male? Well, I think Dr. Quayle did at the time that she was interviewed by HR. And then in the intervening months. That's not making a complaint. That's complaining that they were being treated differently than her. That's not making a complaint that they were discriminating against people or being abusive in the workplace. Yes, that's true. Was there a contemporaneous complaint that was uninvestigated? I can't point you to a specific contemporaneous complaint that was uninvestigated. What I can tell you is that in the intervening months, September, November, January, the CEO had multiple interviews with multiple women physicians who raised these same issues of men behaving in this manner and not being subject to any sort of complaint or investigation or discipline. Well, were there formal complaints made against anybody other than Dr. Quayle? I'm not aware of. I can't provide you with an answer of any formal complaints. How can we determine if she's being treated dissimilarly when there's no similar comparator? I think when she raises the identities of two similar males in her interview with HR and the HR director admits that she understood that to be a complaint of gender discrimination and did nothing to investigate to see if either of those men had engaged in similar behavior, that would be a fair comparison right there. Well, that sounds to me like an argument that you can sort of insulate yourself against a claim by claiming without evidence that other people are being treated differently. Well, I think she told the HR director that she had observed Dr. Carpio, her partner, engaging in similar or worse conduct. So it's not as if she was just pulling names out of the air when she raised this. But I'd also just suggest that at this stage of the process, the identity of a comparator is not necessary to get this case to a trial. Is there in the summary judgment record deposition testimony as to exactly what was said to the HR folks? Yes, it's in the record in Appendix Volume 4, the testimony of Dr. Quayle and of Kathy Roberts, the HR director, as well as in a memo prepared by Kathy Roberts that's in Volume 2 of the transcript. And I see that I'm out of time. Thank you very much, Your Honors. Let's hear from the hospital. Mr. Saby. Thank you. Thank you, Your Honors. May it please the Court. I'm Brian Saby. I represent the defendant and Appellee Mercy Regional Medical Center. The Supreme Court has stated that in disparate treatment discrimination cases such as this, quote, the ultimate question is whether the employer intentionally discriminated, period, end quote. That's Reeves v. Sanderson Plumbing, 530 U.S. 133. And the same, of course, is true of retaliation. The ultimate question is whether the employer intentionally retaliated. Here, Dr. Quayle has not produced any evidence and has hardly even ventured to claim that the admitted decision maker, the CEO, Will McConnell, intentionally discriminated or retaliated against her. Summary judgment should be affirmed, and I can very briefly state three additional reasons why each of them sufficient to support summary judgment. First, Dr. Quayle has admitted, at least twice, that the reason CEO McConnell decided to terminate her employment was that she refused to take responsibility for her behavior of July 25, 2017. Case closed. But despite these admissions, she attempts to take refuge in the McDonnell-Douglas burden-shifting framework. The entire purpose of that framework is to test the motive for the adverse employment action. And where the motive is admitted, it would seem that the framework is superfluous. But in any event, given the undisputed facts about her behavior of July 25th and the admission about what motivated the termination decision, the only conceivable way that she could show pretext under the McDonnell-Douglas burden-shifting framework would be to produce some male physician who engaged in comparable behavior and yet was treated more favorably than she was. Can I just stop you there? Can you respond to your opposing counsel's argument that multiple explanations for her termination, that forms pretext on its own? Yeah. So there were different ways that the termination decision was explained, but they were all consistent. And most of them are largely overlapping. So the history of the situation is that she engaged in the behavior on July 25th, 2017. She was then required to take responsibility for that behavior. She refused. She was terminated because she ultimately, after a significant process of negotiation, persisted in her refusal to take responsibility for that behavior. And then the termination was done without cause under the contract as a negotiated concession so that she could continue to practice and maintain her privileges at Mercy Regional Medical Center. So we're going to find in the record the evidence of this negotiation about her separation. Yes. Let me cite you to Volume 3 of the record, page 55. And let me just read from, this is an email from Dr. Quayle to CEO McConnell. Quote, accordingly, as part of my transition, I would like to be released from the non-compete provision in my contract and maintain my privileges at Mercy. As I understand my contract, because we are mutually agreeing on this separation, the end of my employment will not result in the cancellation of my privileges. So that does not use the word, the phrase, without cause. But that is the concept that is being referred to, because if she had been terminated for cause under the contract, she would have lost her privileges. It is, of course, true, as opposing counsel has indicated, that there was no final agreement that was memorialized in a separation agreement. But there was a prolonged process of negotiation in which she requested that the terms of separation be what she requested. And some of those requests were ultimately granted and others were not. Was she released from her non-compete? She was. Okay. And currently competes with my client. So her failure to produce a comparator is the second reason that summary judgment, the second sufficient reason that summary judgment should be upheld. But more fundamentally, her theory of discrimination is that the unconscious bias of staff to perceive her behavior more severely than they would have perceived comparable male physician behavior, and therefore her behavior was reported where male physician behavior was not reported. And that is not intentional discrimination. That is not illegal under Title VII. No reasonable person would understand that to be illegal under Title VII, and therefore complaining about it is not even protected activity. What about counsel's argument that while Dr. Quayle herself made, you know, essentially two complaints to management, which then had an obligation to investigate and resolve? The complaints, what do you refer to with the two complaints? Opposing counsel said that she, when she was asked about her conduct, said that other male physicians did the same thing and were not disciplined. She did. Certainly she was very vocal, not only after the events of July 25th were being investigated, but after her 2015 trip, she mentioned this theory that she had that men were engaged in. Didn't the hospital then have a duty where they're on notice of comparable behavior? Didn't that place the hospital on notice that they needed to investigate her claims? If there was a reasonable basis for her claims, I would say yes. Or I would say if the decision maker became aware of another male physician who'd engaged in comparable behavior, whom that decision maker was also responsible for, that would be a situation and that would be a very different case. That would be a situation where there would be a duty to respond similarly. That's what I understand opposing counsel's argument to be. Well, there has never been any concrete behavior of a male physician that's been identified that was anywhere close to what happened on July 25th, 2017. I think Dr. Quayle said there was. I mean, we're here on summary judgment. Why isn't her, you know, I'm being hammered for this behavior that happens all the time on the floor. Yeah. Well, unconscious bias is not illegal under Title VII. The only situations in which there would be. That's not my question. I understand the theory that staff complains about the female doctors and not the male doctors. I guess my question is different, and that is you had somebody, Dr. Quayle, make a, I'm going to call it a formal complaint, but a complaint. So it's not coming from the nurse staff. It's coming from a fellow doctor. She's saying I'm being singled out. Why doesn't that at least create some kind of fact question here? Well, there was, she, on summary judgment, it's her duty to provide admissible evidence from which the fact finder could conclude that the stated reason for termination is unworthy of belief. That's her burden. She clearly failed to meet that because although she did make conclusory statements that she was being treated differently from males, she failed to identify any particular male physician who was comparably situated and who was treated more favorably. Opposing counsel mentioned. What are you talking, let's drill down on what's comparably situated because, and we go back to what your opposing counsel was saying, as I understood it. I think I was hearing sort of the same thing the chief was. As I was hearing it, it was she was in the meeting. She said, why are you doing this? I can't remember the doctor's name, but Dr. So-and-so did this, which is basically the same as I'm accused of doing, and nobody said anything about him. He didn't get in trouble for it. Why am I in trouble for it? Yeah, that was Dr. Carpio that opposing counsel mentioned. And her allegations about what Dr. Carpio said, as I recall, were fairly vague and were just basically that he also used profanity and said something not nice about a patient. Contrast that with what Chief Judge Brimmer determined to be the undisputed facts regarding the events of July 25, 2017. His opinion gives a very reserved and understated recitation of those undisputed facts as follows. Quote, Plaintiff told C.G. during the procedure, while he was in significant pain, that he needed to hold still and that you should have taken responsibility for your own health, and that's why you're in this situation. After the procedure, just outside of the room, Plaintiff called C.G. an asshole. She then refused to come back into the room and speak with C.G. Employees subsequently complained about Plaintiff's handling of C.G.'s procedure. End quote. Now, note that Dr. Quayle has not appealed any of those factual determinations, so those stand as undisputed for purposes of this appeal. And although reserved and understated, Chief Judge Brimmer's recitation of the facts clearly show why he reasonably felt that she needed to be required to take responsibility for her behavior. And so I guess, Dr. Carpio, the evidence when we get in the record is going to show us that he was not similarly situated. Maybe he wasn't within earshot of the patient. Yeah, I know for a fact that completely absent from the record is any evidence that Dr. Carpio refused to come back into the room and see a patient after performing a difficult procedure on the patient. And I believe the entire premise of Plaintiff's case is that the male behavior wasn't being reported. It's not that it was being reported and then treated differently. It was that it wasn't being reported in the first place. Now, I know that Judge Timkovich has questioned whether that allegation leads to a duty to investigate. And I would say certainly it's desirable to take steps to make sure that comparable behavior receives a comparable response. But there was really no plausible case. There was no plausible evidence supporting Dr. Quayle's assertion that anybody engaged in comparable behavior to that and was treated differently. Is there any evidence in the record as to, let's pick on Dr. Carpio, who's not part of the case, but is there any evidence in the record that after she made statements about him that there was no investigation or is it just her statement that she made a complaint and there was no investigation? All that the record reflects is that she asserted, to the best of my recollection, what the record reflects is that she asserted that males were treated differently and that males weren't being reported for similar behavior. And she mentioned Dr. Carpio kind of offhand as one example, but without giving any concrete details that would justify her assertion that he was comparably situated. And honestly, they haven't even really attempted to assert that either in resisting summary judgment or on appeal that he was comparably situated. I'd like to just briefly touch on the alleged post-termination retaliation claim that is also partly at issue in this appeal. Dr. Quayle's reply brief on appeal emphasized the volume of the content in her pleadings and briefing that was devoted to facts about the alleged post-termination retaliation. Specifically, she pointed out that allegedly 18 paragraphs in her complaint were devoted to the failure to provide call pay post-termination. And I would have two points about that. First and less importantly, 18 paragraphs about post-termination call pay is not all that impressive when the complaint is a behemoth 309-paragraph entity. And I would say that every mention of the denial of call pay other than those 18 paragraphs in the complaint has been parenthetical. Go ahead and finish up your second thought. More importantly, the post-termination call pay has never been framed, never been organized, never been presented as supporting a separate and independent claim, but rather just additional damages prior to this appeal. And I therefore ask that summary judgment be affirmed. All right, counsel, thank you. We appreciate it. Your counsel are excused and the case shall be submitted.